[Cite as *State v. Dew*, 2024-Ohio-69.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                :

    Plaintiff-Appellee,              :

    v.                                        :

WILLIAM DEW,                                :

    Defendant-Appellant.          :

No. 112593

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 11, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-660693-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Adrienne E. Linnick, Assistant Prosecuting Attorney, *for appellee.*

Wegman Hessler Valore and Dean M. Valore, *for appellant.*

KATHLEEN ANN KEOUGH, A.J.:

{¶ 1} Defendant-appellant, William Dew, appeals from the trial court's judgment of conviction entered following a jury trial and the court's denial of his

motion for a new trial. For the reasons that follow, we affirm his convictions and the trial court's decision denying his motion for a new trial.

## I.  Procedural History

{¶ 2}  In August 2021, Dew was named in a ten-count indictment charging him with rape, in violation of R.C. 2907.02(A)(1)(b) with a sexual motivation specification (Count 1); rape, in violation of R.C. 2907.02(A)(2) (Counts 2-6); domestic violence, in violation of R.C. 2919.25(A) (Count 7); one count of endangering children, in violation of R.C. 2919.22(B)(1) with a furthermore specification of serious physical harm (Count 8); endangering children, in violation of R.C. 2919.22(B)(1) (Count 9); and interference with custody, in violation of R.C. 2919.23(A)(1) (Count 10).[1] The charges stemmed from allegations that Dew sexually assaulted his daughter.

## II.  Jury Trial

{¶ 3}  Prior to the start of trial, the state moved to amend Count 1 by deleting the sexual motivation specification and dismissed Count 8. The remaining offenses were tried to a jury that considered the following testimony and evidence.

{¶ 4}  In 2020, Antoinette Tredanary accepted the victim into her home after receiving a call from the Mentor Police Department. According to Antoinette, the victim's grandmother had just passed away, and the victim told her that she had nowhere to go. She said that during this time, the Lake County Division of Children

---

[1] Dominic Tredanary, Sr. ("Dominic"), was also named as a codefendant in Counts 8-10.

and Family Services ("LCDCFS") had an informal involvement — just checking in with the victim; making sure she was safe and attending school. She said that the victim lived with her for about two months and regularly attended school, but that the victim wanted to go back and live with Dew. In July 2020, LCDCFS permitted the victim to go back with Dew, who now lived with Antoinette's brother, Dominic, on West 105th in Cuyahoga County. Antoinette testified that after the victim returned to live with Dew, she received calls from LCDCFS and the school system because the victim was no longer attending school.

{¶ 5} Tanya Minich, a supervisor with the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"), testified that in March 2021, the victim and Dew first came to the agency's attention because the victim was not attending school. She said she tried to contact Dew, Antoinette, and Dominic in an effort to locate the victim. Minich testified that she and her colleagues made numerous unsuccessful attempts to visit the victim at Dominic's home, but were unable to access the inside of the home. She said that when she finally spoke with Dew over the phone, he declined to provide any information or discuss the situation.

{¶ 6} On March 25, 2021, a child protection specialist visited Dominic's home and found the victim outside with three adult men, including Dew, who appeared intoxicated. According to Minich, neither Dominic nor Dew would allow the specialist to speak with the victim. Accordingly, the police were notified, but by the time police arrived, all four had gone into the home and closed the door. She stated that they were unable to obtain access inside the home without a warrant.

Minich testified that CCDCFS then obtained a "telephonic emergency custody order" of the victim, but they were unable to get physical possession of the victim at that time. On April 8, 2021, CCDCFS filed a complaint for neglect and temporary custody of the victim. Following a hearing on April 29, 2021, CCDCFS obtained pre-dispositional emergency temporary custody of the victim, and on April 30, 2021, the agency filed a missing person's report.

{¶ 7} Minich testified that on May 19, 2021, she obtained Dew's phone number from Mentor schools and spoke with Dew on the phone. According to Minich, Dew acknowledged that CCDCFS had obtained custody of the victim, which he was interfering with, but indicated that he was not willing to provide the agency with any information. She stated that on May 20, 2021, the agency filed charges against Dew for interfering with custody.

{¶ 8} In the meantime, Minich spoke with the victim's half-sister, A.K. During their conversations on May 19 and 28, 2021, A.K. expressed concerns that "her younger sister was being sexually molested" by Dominic. Minich testified that on June 15, 2021, Cleveland police removed the victim from Dominic's home and transported the victim to MetroHealth Medical Center.

{¶ 9} Sergeant Dustin Vowell testified that he was working as a detective with Cleveland Police Department Sex Crimes Unit when he received information that the victim was being sexually abused at Dominic's home. He said that he obtained a search warrant for the residence located at 3485 West 105th Street in Cleveland. Sergeant Vowell testified that the search warrant was executed at the

residence on June 15, 2021, with the assistance of the SWAT unit. Once inside the residence, officers located the victim and Dew's developmentally disabled sister living in deplorable living conditions. Detective Vowell testified that the inside of the residence was "probably one of the worst residences I've personally gone in on a search warrant." (Tr. 973.) The jury saw photographs of the conditions inside of Dominic's home that included mounds of clutter, garbage, debris, and animal feces.

{¶ 10} Michael Bokmiller, a supervisor in CCDCFS's sex abuse unit, testified that he was assigned to the victim's case on May 28, 2021, when the agency received an allegation that the victim was being sexually abused by Dominic. He stated that Tabitha Mazza, a social worker with CCDCFS, was assigned, and with the help of the Cleveland police department, attempted to locate the victim at Dominic's home.

{¶ 11} He stated that on June 15, 2021, he received a call that Cleveland police had recovered the victim and arrested Dominic. Bokmiller testified that he met the victim at MetroHealth Medical Center and when he informed her of the allegations against Dominic, "her immediate response was to deny that Dominic had done anything[,] and she immediately said that [Dew] had been raping her for four years." (Tr. 532.) Bokmiller said that the victim "specifically said that [the abuse occurred] since she was 12. And at the time of this — at this point in 2021 she was 16." (Tr. 535.) He stated that the victim disclosed to him that the last incident of abuse occurred about "a month ago," and that Dominic confronted Dew about it because she confided in Dominic about "something that her father had done." (Tr. 532.) Bokmiller testified that the victim was extremely upset that she would be

placed in foster care and not with the Tredanary family, specifically, with Antoinette. He admitted, however, that she never requested that she be returned to Dew's custody.

{¶ 12} Tabitha Mazza testified that she previously worked at CCDCFS as an investigative worker in the sex abuse unit. Her duties included completing the investigation to ensure child safety and conducting forensic interviews to assess if the allegations of abuse were substantiated. Mazza stated that she was assigned to the victim's case and that the victim completed two forensic interviews. She said that Chavely Hernandez conducted the first interview the day after the victim was recovered, and Mazza conducted a follow-up interview approximately a month later.

{¶ 13} According to Mazza, the victim made "disclosures" during her interview with Hernandez that Mazza believed were "important" to follow up on. Although Mazza was not permitted to testify about those disclosures, she testified that the victim reported to her that "she had been raped by [Dew]" multiple times. (Tr. 598-599.) She said that the victim disclosed that the most recent assault had occurred approximately one month prior to her removal from Dominic's home, but that the sexual abuse began when she was younger. According to Mazza, the victim's disclosures were not particularly specific, which she said is not uncommon in forensic interviews of child victims. Mazza said that despite the victim being asked to describe exactly what had occurred, she only responded that Dew raped her and "she was very hesitant on giving me the information. * * * She said, he made me [perform fellatio]. And then she just said had sex." (Tr. 600). According to Mazza,

the victim did not provide details or expound about "rape" and "sex." She found it significant that the victim's disclosures lacked detail, particularly because at age 16, she would be able to provide more detail. The victim told Mazza that on one occasion, Dew "gave her something" because she was not feeling well and then he raped her. (Tr. 599.) Mazza said that the victim also described the final sexual assault when she tried to fight back and Dew punched her in the face. (Tr. 637-638.) According to Mazza, the victim did not want to return to Dew's custody — "[the victim] said that the way she was feeling right now she could shoot [Dew] and not care." (Tr. 602.) She said that the victim was angry with Dew for "abandoning her," which Mazza acknowledged could be a reason why the victim was accusing him of sexual abuse. (Tr. 616, 623-624.)

{¶ 14} Mazza testified that she attempted to reach out to Dew about the victim's allegations. She stated that she briefly talked to him after she received a call from A.K. According to Mazza, Dew told her "no and hung up." (Tr. 605.) She said that was the last contact she had with him.

{¶ 15} On cross-examination, Mazza acknowledged the victim's relationship with Dominic made her uneasy because he was an adult male whom the victim spoke of with admiration and defended. According to Mazza, Dominic appeared to have engaged in grooming behaviors with the victim, while Dew had not. (Tr. 623.) She stated that the victim found Dominic to be more of a "real dad than her own father," and that "he's the only one that protects her." (Tr. 617.) In fact, when Mazza discussed with the victim the condition of Dominic's house and that it was described

as "very disgusting" and the "worst house anybody [had] ever seen," the victim was defensive about the conditions, stating that they were going to clean it the day the police arrived. (Tr. 627.) Mazza stated that A.K. told her in June 2021 that she had concerns that Dominic was sexually abusing the victim.

{¶ 16} Chavely Hernandez testified that she previously worked at CCDCFS as a short-term service worker in the sex abuse unit. She explained that her job duties included investigating allegations of sexual abuse. Hernandez testified that she conducted a forensic interview with the victim, who told her that "her father had raped her multiple times" starting at the age of 12 until she was 16 years old. (Tr. 1054.)

{¶ 17} A.K. testified that she was Dew's biological child and that the victim was her half-sister. Even though she was close with Dew during her childhood, she was not close with the victim. A.K. testified that in 2020, the victim lived in Mentor with Dew, his mother, and his autistic sister. She said that in July 2020, she attempted to visit her father at his home in Mentor, but no one was home — after that she lost contact with Dew. A.K. stated that she learned in December 2020 from Dew's friend that her grandmother had passed away in July 2020.

{¶ 18} A.K. testified that she then began searching for the victim and Dew. She said that she communicated with Dominic, a friend of Dew's, to try to locate them. According to A.K., Dominic would only give her "updates" that the victim and Dew were "fine." (Tr. 353-354.) She said that Dominic was not giving her "the information I wanted [about how they were doing]. Just little bits and pieces that

made no sense to me." (Tr. 361.) She testified that she attempted to reach both the victim and Dew by posting on a Mentor Facebook page, and during the summer of 2021, she distributed fliers containing pictures of them because she believed "they were missing." (Tr. 361.) She also stated that Mentor Police contacted her and she reported to them that both the victim and Dew were missing.

{¶ 19} A.K. testified that in September 2021, she saw Dew at a local convenience store and they rekindled their father-daughter relationship. She stated that they began to see each other more regularly, usually at her home or the park. She said that during these visits she asked about the victim maybe "only once or twice." (Tr. 372.) She said that she regularly visited with Dew until January 2022. In fact, A.K. admitted that the state compelled her to testify at trial.

{¶ 20} A.K testified that she did not remember contacting law enforcement or making any missing person report because it was "so long ago." However, the state introduced evidence that in April 2021, A.K. filed a missing person's report regarding the victim and Dew, and Mazza and Minich both testified that they spoke with A.K. about her concerns regarding the victim. Minich testified that she spoke with A.K. in May 2021, and Mazza stated that she met with A.K. in June 2021.

{¶ 21} During her testimony, the court declared A.K. as a court's witness when A.K. became evasive and denied having any independent recollection of a video-recorded interview with Cleveland police on June 16, 2021. The state showed A.K. the video recording in an attempt to refresh her recollection. A.K. acknowledged that the video showed various things — the time stamp and that she

was in the video — but maintained she did not recall the event. She further denied knowing the identity of the other person shown in the video but acknowledged that person was wearing a police badge. The state then had A.K. listen to the recorded interview on headphones. Even after listening to the entire interview, she again denied having any independent recollection of the encounter. After being declared a court's witness, A.K. eventually acknowledged telling the police in the interview that she was concerned for the victim because Dew was "dangerous," that she believed Dew was touching the victim inappropriately, and that Dew should not have custody of either the victim or his disabled sister. (Tr. 389-390, 420.)

{¶ 22} On cross-examination, A.K. testified that she had also raised concerns that Dominic was sexually abusing the victim and the victim never told her that Dew "was doing anything inappropriate to her." (Tr. 416.)

{¶ 23} The victim testified that at age twelve, she lived with her mother and Dew in his Mentor home. She said that her mother passed away on October 20, 2016. The victim stated that following her mother's death, her relationship with Dew "escalated down pretty quick." (Tr. 685.) She said that he blamed her for his inability to date women, calling her a "cockblocker." (Tr. 685-686.) She described one incident where Dew broke her phone while she was talking to her sister K.H., and said that her mother's ex-boyfriend threatened Dew about the incident. She also testified that Dew would remark on the similarity between her appearance and that of her mother, and she felt that the comment was not "like in a daughterly

manner" or that it was "in like a good thing." (Tr. 688.) She stated that she was "terrified of him for a long time." (Tr. 708.)

{¶ 24} The victim testified about the first time Dew sexually assaulted her. She said that it occurred in the summer or fall, "right around the time after my mom passed" when she was between "12 and 13," after she told Dew that she had a bad toothache. (Tr. 693-694, 700.) The victim said Dew gave her a white powdery substance to rub on her tooth, which caused her to "feel like there was really heavy weights on my eyes that was preventing me from trying to open them. I was slurring my words. I couldn't sit up straight. I wasn't able to walk by myself." (Tr. 695.) She stated that Dew then took her to the store with him to purchase cigarettes. The victim said that Dew had to help her to the car because she was unstable. She described "blacking in and out" in the car on the way to and from the store. She remembered "more of a black out and just pain * * * pain that I never want to feel again." (Tr. 696-697.) The victim stated that her "pants were pulled down" and that she felt pain in her vagina "like there was being something forced that my body wasn't accepting of." (Tr. 698.) She said that Dew was causing this pain — "it felt as if he had had his [penis] in me." (Tr. 699.) The victim said that she was unsure how long the assault occurred, but when she woke, she could tell her pants had been manipulated. She stated this was not the only time that Dew sexually assaulted her; she was unsure of the total number of times but believed that it occurred more than five times.

{¶ 25} The victim said the last assault occurred in June 2021, when she tried fighting back, but ended up with a black eye. (Tr. 708.) The victim remembered that she was walking with Dew on the street and then went down an alley when he "just went to snatch" her and grabbed her arms. She stated that when she defended herself, Dew punched her. (Tr. 714-715) The victim said that she "started to gain some type of consciousness" and "feeling a really bad pain" in her vagina. (Tr. 717-718.) The victim testified that this pain was from Dew raping her. She said that after gaining consciousness, she found her way back to Dominic's house, where she locked herself in an upstairs bedroom. According the victim, when Dominic woke her, he noticed her eye and questioned her about it. She said she confided to Dominic what Dew had done and that Dominic confronted Dew about her disclosure. She stated that after this confrontation, Dew left the house and never hurt her again.

{¶ 26} The victim testified that other sexual assaults occurred but she admitted that the details were "not vivid enough * * * to even remember where it happened." (Tr. 733.) She stated that she remembered, however, that Dew forced her to perform fellatio when she was age 14 or 15. (Tr. 734.)

{¶ 27} On cross-examination, the victim acknowledged that she resented Dew and was angry at him over his failure as a father to provide for her. She stated that Dominic acted more like a father to her, and she admitted that she wanted to help and protect him. The jury also heard the victim admit that her statements to police and others were often contradictory, including some of the details

surrounding the sexual assaults. Nevertheless, the victim unequivocally stated that Dew raped her from age 12 until she was 16.

{¶ 28} At the close of the state's case-in-chief, the court granted the state's Crim.R. 7(D) motion to amend the indictment to conform with the evidence at trial in Counts 1, 2, and 6, and granted Dew's Crim.R. 29 motion for judgment of acquittal on Counts 3, 4, and 5 that all charged Dew with rape.[2]

{¶ 29} The jury found Dew guilty of rape as amended in Counts 1 and 2; rape as amended in renumbered Count 3; domestic violence as charged in renumbered Count 4; endangering children as charged in renumbered Count 5; and interference with custody as charged in renumbered Count 6.

{¶ 30} Prior to sentencing, Dew filed a Crim.R. 33 motion for a new trial, contending that the victim allegedly sent text and social media messages to her sister and niece recanting her accusations against Dew. Following an evidentiary hearing, the trial court denied Dew's motion.

{¶ 31} At sentencing and following the application of the Reagan Tokes Law on qualifying offenses, the trial court imposed concurrent sentences and ordered Dew to a life sentence with parole eligibility after serving ten years in prison.

{¶ 32} Dew now appeals, raising four assignments of error that will be addressed out of order.

---

[2] Following this ruling, the trial court renumbered the counts the jury would consider so that the counts were identified sequentially. Hereinafter, this court will refer to the counts in the indictment as they were renumbered.

### III. Sufficiency of the Evidence

{¶ 33} In his fourth assignment of error, Dew contends that his conviction for rape, as charged in Count 1 of the indictment, was not supported by sufficient evidence. Specifically, he contends that the state presented insufficient evidence that the victim was under the age of 13 at the time of the offense because the victim only offered a vague recollection of when the first rape occurred; she could not specify a more precise date.

{¶ 34} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Cottingham*, 8th Dist. Cuyahoga No. 109100, 2020-Ohio-4220, ¶ 32. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶ 35} Count 1 of the indictment charged Dew with rape in violation of R.C. 2907.02(A)(1)(b), which alleged that he engaged in sexual conduct with the victim whose age at the time of the offense was less than 13 years old. Although the victim's age is an essential element under this section, "the state need not establish precise dates of when the offense occurred, as long as a rational trier of fact could find that

the victim was less than 13 years of age at the time of the offense." *State v. Schwarzman*, 8th Dist. Cuyahoga No. 100337, 2014-Ohio-2393, ¶ 16, citing *State v. Nelson*, 8th Dist. Cuyahoga No. 54905, 1989 Ohio App. LEXIS 147 (Jan. 19, 1989).

{¶ 36} In this case, the victim testified she was born in June 2004, and that Dew first raped her when she was 12 years old. She remembered that it occurred after her mother passed away on October 20, 2016. At the time of her mother's passing, the victim was 12 years old. Although she could not specifically recall the exact date of the rape, she testified that it occurred "shortly after" and "right around the time after [her mother] had passed away." (Tr. 693, 703.) The victim stated that the first rape occurred either in the summer or fall, the leaves on the trees were green and some were changing, and that she was not wearing a coat. (Tr. 699.)

{¶ 37} Viewing the victim's testimony in favor of the state, a rational trier of fact could find that this testimony demonstrated that at the time of the rape, the victim was less than 13 years of age. Accordingly, the stated presented sufficient evidence to support the rape conviction as charged in Count 1. Dew's fourth assignment of error is overruled.

## IV. Confrontation and Rape Shield

{¶ 38} Absent a specific exception, Ohio's rape-shield law protects both the victim and the defendant from the admission of evidence of prior consensual and nonconsensual sexual activity. *State v. Jeffries*, 160 Ohio St.3d 300, 2020-Ohio-1359, 156 N.E.3d 859, ¶ 30. However, "[b]ecause prior false accusations of rape do not constitute 'sexual activity' of the victim, the rape-shield law does not exclude

such evidence." *State v. Boggs*, 63 Ohio St.3d 418,423, 588 N.E.2d 813 (1992); *State v. Dandridge*, 8th Dist. Cuyahoga No. 109608, 2021-Ohio-3355, ¶ 79. Accordingly, "before cross-examination of a rape victim as to prior false rape accusations may proceed, the trial judge shall hold an *in camera* hearing to ascertain whether such testimony involves sexual activity and thus is inadmissible under R.C. 2907.02(D), or is totally unfounded and admissible for impeachment of the victim." (Emphasis sic.) *Boggs* at 424. The defense bears the burden of demonstrating that the accusations were totally false and unfounded before a trial court will consider permitting the defense to cross-examine on prior false accusations. *Id.* at 423. Even if false accusations are proven, it is still within the sound discretion of the trial court, pursuant to Evid.R. 608(B), whether to allow such cross-examination. *Id.* at 424.

{¶ 39} Application of the rape-shield statute may not, however, unduly infringe upon a defendant's constitutional right of confrontation, right to a fair trial, and right to present a defense. *State v. Dawson*, 2017-Ohio-965, 86 N.E.3d 672, ¶ 21 (8th Dist.), citing *State v. Young*, 8th Dist. Cuyahoga No. 92127, 2009-Ohio-5354; *State v. Gardner*, 59 Ohio St.2d 14, 17-18, 391 N.E.2d 337 (1979). In determining whether the law would unconstitutionally infringe on a defendant's rights, "the trial court must balance the interests of the law against the probative value of the evidence excluded by the trial court." *Gardner* at *id.* "In order for the contested evidence to be admitted, its probative value must be more important than merely to attack the credibility of a witness." *Gardner* at 17.

{¶ 40} Dew requested a *Boggs* hearing, contending that the victim disclosed to him that a bus driver had previously raped her. He claimed that because the victim told the police that only Dew had ever raped her, a hearing was necessary to determine whether this prior accusation of sexual activity was false and the victim could be subject to cross-examination on the accusation.

{¶ 41} The trial court conducted a hearing at which the victim testified about two prior incidents. The victim stated that the first incident occurred during the bus ride on the way home from school. She stated that the driver of a school transportation van stopped at a gas station and purchased three cups of coffee. She testified that after drinking the coffee, she "started feeling really weird." (Tr. 134.) She stated that she remembered that she started to doze off, but that she remembered him putting "his hand on his private part * * * his penis." (Tr. 136-137.) On cross-examination, she admitted that she told Dew that she was raped on the school bus by the driver but was now unable to provide "full details because I don't 100 percent completely remember because I've been putting it behind me." (Tr. 139.) She admitted that she did not tell the police officers the truth about this incident because she "didn't want to bring anything else into it." (Tr. 142.)

{¶ 42} During the hearing, the victim also disclosed that another individual by the name of "John" had raped her. She testified that she told her friend that this occurred. Although the victim first stated that the accusations against John were false, (tr. 145), she clarified, stating the statement that she made to her friend about John raping her was not a false statement. (Tr. 146.)

{¶ 43} At the close of the hearing, the trial court concluded that Dew

> failed to meet [his] burden of establishing that the victim's prior accusations were clearly unfounded. As such, the [c]ourt is not going to allow any cross-examination or mentions regarding the bus driver sexual assault or any sexual assault regarding John. Lastly, even in construing this evidence in the light most favorable to the defense, the probative value of any relevant evidence would be substantially outweighed by unfair prejudice.

(Tr. 153-154.) The defense asked whether it could question the victim about being truthful with the police. The trial court clarified the defense would be "held to that answer that she gives," and that it would not be permitted "to get into any allegations of prior sexual activity, false accusations, alleged false accusations that are not false regarding the bus driver Mentor or John. Don't bring up any of that stuff." (Tr. 154.)

{¶ 44} Prior to the victim testifying at trial, the court again addressed its *Boggs* hearing decision regarding whether the defense could cross-examine the victim about her being untruthful with the police about whether she had any prior incidents of sexual activity resulting in sexual assaults. The court concluded that "being cross-examined on that statement would violate rape shield. So, I'm going to preclude the defense from cross-examining her regarding the statement to police that she's never been a victim of sexual assault regarding anyone besides" Dew. (Tr. 329-330.) The court clarified for the defense, "[m]y ruling will continue to stand regarding any previous allegations of false sexual assaults, that there was not clear evidence produced by the defendant that [the victim] has any previous false accusations of sexual assault and as such, there will be no questioning as to any incident of sexual assault regarding the bus driver or John." (Tr. 330.)

{¶ 45} In his second assignment of error, Dew contends that he was denied due process of law when the trial court violated his right to confront witnesses by denying him the ability to cross-examine the victim about her prior allegations that she was sexually assaulted by a school transportation bus driver and "John." Specifically, Dew contends that the victim did not testify that any actual sexual activity occurred in either incident, and thus the rape-shield statute did not apply.

{¶ 46} The trial court held a *Boggs* hearing to determine whether the victim's prior accusations of sexual abuse by the bus driver and "John" were false, and whether cross-examination on that subject would be allowed at trial. At the hearing, the victim admitted that she told her father that the bus driver raped her and testified that her accusation against the driver was truthful and that sexual activity was involved. Additionally, the victim admitted that she told her friends that "John" raped her. Although her responses to questions were confusing about whether her statement to her friends was truthful when specifically asked, the victim said that the statement about John was not false. Accordingly, because the victim never admitted that she made any prior false accusations, further inquiry on the prior abuse was prohibited by Ohio's rape-shield law. *See Boggs*, 63 Ohio St.3d at 421-423, 588 N.E.2d 813.

{¶ 47} Admittedly, the victim gave vague and conflicting testimony during the *Boggs* hearing. Nevertheless, the trial court determined that Dew failed to withstand his burden of demonstrating that the sexual activity alleged between the bus driver and John were fabrications or totally unfounded. As such, the trial court

did not abuse its discretion in finding that the evidence falls within R.C. 2907.02(D) and was not admissible under the rape-shield statute.

{¶ 48} Moreover, we find that the evidence of the prior abuse merely served as a means to attack the victim's credibility, which is insufficient to overcome the rape-shield law. Accordingly, even if no sexual activity was involved, the trial acted within its discretion under Evid.R. 608(B) to prohibit the defense from questioning the victim about her prior accusations.

{¶ 49} Dew's second assignment of error is overruled.

## V. Crim.R. 33 Motion for a New Trial

{¶ 50} After a jury found Dew guilty, but prior to sentencing, Dew sought a new trial pursuant to Crim.R. 33(A)(2) and (6) and R.C. 2945.79. In support, he provided affidavits from A.K. and her daughter, E.A., averring that they received social media and text messages from the victim recanting her trial testimony. According to Dew, this newly discovered evidence is sufficient to warrant a new trial.

{¶ 51} The trial court conducted a hearing on Dew's motion, and both A.K. and E.A. provided sworn testimony. Photographs of the messages allegedly sent by the victim were introduced into evidence. During the hearing, A.K. testified about the circumstances surrounding the messages. She stated that on November 18, 2022, she received a text message from an unknown number, allegedly from the victim, indicating that her accusations were meant to "get rid of" Dew. A.K. testified that a few days later, she received Facebook messages again purportedly from the victim stating that Dew "never touched her" and that she "lied to everyone."

According to A.K., the victim apologized for "blocking her" on Facebook, but created this new page to communicate with her. Despite creating the new page for this purpose, "the victim" told A.K. that the new page would be deleted after this communication. On cross-examination, A.K. admitted that since the guilty verdict, there had been 134 calls with Dew and that he knew someone communicated with the victim about lying. Additionally, she acknowledged that she cancelled the appointment with the detective who wanted to check her phone regarding the texts and communications that were allegedly from the victim. Finally, although A.K. believed that the messages were from the victim, she admitted that she did not have any information to confirm who sent the messages.

{¶ 52} E.A. also testified about text messages she allegedly received from the victim on November 20, 2022. She stated that she was not close with the victim and was thus, surprised that she received these messages because she did not have the victim's cell phone number or give the victim her phone number. She stated that she had no desire to reach out to the victim nor did she want to help Dew, even stating that "I just don't like him." (Tr. 1263.) She admitted that she did not know who actually sent her the messages.

{¶ 53} Following the hearing, the trial court issued a detailed written decision denying Dew's motion. The court determined that the circumstances surrounding the receipt of the messages "suggest[s] that those communications did not come from [the victim]." In making this conclusion, the court reasoned:

First, there is no credible evidence [that the victim] is behind these alleged recantations. The text messages sent to [A.K.] and [E.A.] came from two different, unknown phone numbers. Further, the Facebook communications with [A.K.] came from a newly-created Facebook page. If [the victim] wanted to communicate with [A.K.] via Facebook, she could simply "unblock" her from her main Facebook page. The fact that these communications took place instead over a newly-created Facebook page raises great suspicion with this Court.

The trial court further determined that even if the victim sent the communications, they would have only served to contradict or impeach the victim's trial testimony, which under the relevant case law, was insufficient for granting a new trial.

{¶ 54} In his first assignment of error, Dew contends that the trial court erred in denying his motion.

{¶ 55} A motion for a new trial under either R.C. 2945.79 or Crim.R. 33 may be premised upon newly discovered evidence. Under either authority, a new trial may be granted when new evidence material to the defense is discovered that the defendant could not with reasonable diligence have discovered and produced at the trial and that materially affected the defendant's substantial rights. R.C. 2945.79(F); Crim.R. 33(A)(6). To warrant a new trial based on newly discovered evidence, the defendant must show that the new evidence

> (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶ 56} The decision to grant or deny a motion for a new trial is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 76, 564 N.E.2d 54 (1990). "'Abuse of discretion' is a term of art, describing a judgment neither comporting with the record, nor reason." *Klayman v. Luck*, 8th Dist. Cuyahoga Nos. 97074 and 97075, 2012-Ohio-3354, ¶ 12, citing *State v. Ferranto*, 112 Ohio St. 667, 676-677, 148 N.E. 362 (1925). "'A decision is unreasonable if there is no sound reasoning process that would support that decision.'" *Klayman* at *id.*, quoting *AAAA Ent. Inc. v. River Place Comm. Urban Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 57} Generally, newly discovered evidence that purportedly recants testimony given at trial is looked upon with the utmost caution. *State v. Nash*, 8th Dist. Cuyahoga No. 87635, 2006-Ohio-5925, ¶ 10. An affidavit recanting witness testimony is "'viewed with extreme suspicion because the witness, by making contradictory statements, either lied at trial, or in the current testimony, or both times.'" *Id.*, quoting *State v. Gray*, 8th Dist. Cuyahoga No. 92646, 2010-Ohio-11, ¶ 29. Therefore, "'there must be some compelling reason to accept a recantation over testimony given at trial.'" *Id.*, quoting *State v. Fortson*, 8th Dist. Cuyahoga No. 82545, 2004-Ohio-5387, ¶ 13. When evaluating a motion for a new trial based upon a witness's recanted testimony, the trial court must evaluate the credibility of the recanting witness or in some cases, the source supplying the alleged recantation.

*See, e.g., Toledo v. Easterling*, 26 Ohio App.3d 59, 60, 498 N.E.2d 198 (6th Dist.1985).

{¶ 58} In this case, there was no direct evidence of the victim recanting her accusations or trial testimony. Rather, the source of the evidence was from the sworn testimony of two individuals who believed that they received communications from the victim in which she purportedly recanted her accusations. Despite their sworn statements and testimony, both admitted that they did not know who actually sent the messages.

{¶ 59} We are cognizant that the same trial judge presided over the *Boggs* hearing, the trial, and the hearing on the motion for a new trial. Accordingly, the court was familiar with the testimony of the victim and A.K., including their delivery, demeanor, and relationship with each other and Dew, and therefore, deference to the trial court is given when viewing witness credibility. We find that the trial court exercised a sound reasoning process in finding the circumstances surrounding the receipt of the messages suspect and questioning whether the victim actually sent the communications. Accordingly, we find that the trial court did not abuse its discretion in denying Dew's motion for a new trial.

{¶ 60} The first assignment of error is overruled.

## VI. Reagan Tokes Law

{¶ 61} Dew contends in his third assignment of error that the trial court erred when it sentenced him to an indefinite sentence under S.B. 201, commonly referred to as the Reagan Tokes Law, because the law is unconstitutional under the

United States and Ohio constitutions because it violates due process, the separation-of-powers doctrine, and the right to trial by jury.

{¶ 62} Recently, the Ohio Supreme Court rejected the arguments Dew raises challenging the constitutionality of the Reagan Tokes Law. *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535. The court held that the Reagan Tokes Law is not facially vague or unconstitutional because (1) it provides that offenders receive a hearing before the Department of Rehabilitation and Correction ("DRC") may extend their prison sentence beyond the minimum but within the maximum term imposed by the trial court, (2) the right to a jury trial is not implicated since no determination by the DRC at the hearing changes the sentence range prescribed by the legislature and imposed by the trial court, and (3) the authority it gives the DRC to extend an offender's prison sentence beyond the minimum but within the maximum range imposed by the trial court does not exceed the power given to the executive branch of the government and does not interfere with the trial court's discretion when sentencing the offender. *Id.* at ¶ 25, 28, 40. Accordingly, based on the authority of *Hacker*, this court summarily overrules Dew's challenges to the Reagan Tokes Law and his third assignment of error.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

MARY J. BOYLE, J., and
SEAN C. GALLAGHER, J., CONCUR