[Cite as *State v. Martin*, 2025-Ohio-4953.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 114834 |
| JOJWAN MARTIN, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 30, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-06-490688-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sarah E. Hutnik, Assistant Prosecuting Attorney, *for appellee*.

Patituce & Associates, LLC, Megan M. Patituce, and Joseph C. Patituce, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant Jojwan Martin ("Martin") appeals the denial of his motion for new trial and claims the following errors:

> 1. The trial court abused its discretion in failing to conduct an independent review of the record.

2. The trial court abused its discretion in denying Mr. Martin's motion for new trial.

{¶ 2} We find that the trial court conducted an independent review of the record and reasonably concluded that the recantation testimony of a key eyewitness at Martin's trial was not credible. We, therefore, affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} In January 2007, Martin was charged with one count of aggravated murder, in violation of R.C. 2903.01(A), in connection with the shooting death of Antonio Williams ("Williams") that occurred on November 11, 2006. The charge included one- and three-year firearm specifications.

{¶ 4} Joseph and Janet Oberstar testified at a jury trial that on November 11, 2006, at approximately 2:45 p.m., a car crashed into their home on Hecker Avenue in Cleveland. The driver, later identified as Williams, was in the driver's seat, injured but still breathing. Joseph Oberstar called 911, and Williams was taken to MetroHealth Medical Center where he remained for the next five weeks. Williams had sustained a gunshot wound to his spine that rendered him a quadriplegic. He was eventually transferred to a nursing home where he died from bronchial pneumonia, a complication of quadriplegia.

{¶ 5} Dr. Dan Galita, a Deputy Coroner with the Cuyahoga County Medical Examiner's Office, testified that the bullet entered the left side of Williams's neck and traveled through his spine. In his expert opinion, the gunshot wound to the spine caused the bronchial pneumonia that ultimately caused Williams's death.

{¶ 6} Nine witnesses testified at the trial, including two eyewitnesses, Earwin Watters ("Watters") and Debby Crayton ("Crayton"). Watters testified that on the day of the shooting, he went to Papi's, a convenience store on the corner of East 71st and Hecker Avenue, to buy cigarettes. As he was walking to the store, Watters observed Martin talking to a man in a nearby vehicle. Watters testified that he had known Martin for seven years at the time of the shooting because they used to deal drugs to each other. (Trial tr. 198-199 and 623.)

{¶ 7} As Watters was paying for the cigarettes, he heard a gunshot and the sound of a car "pulling off real fast." (Trial tr. 616.) He looked outside and saw a car turning the corner. Martin, who was chasing the car, fired "two more gunshots" at the car. (Trial tr. 197-200 and 617.) In response to more specific questioning, Watters testified as follows:

Q: Who was chasing the car?

A: Jojwan.

Q: All right. Now, what exactly did you see him doing, be specific, please?

A: Chasing a car, pointing his hand towards the car, chasing it.

Q: Okay. Did you see anything else with respect to his hand?

A: Flashes. When I looked out the door he was chasing the car.

Q: So you were able to see flashes. Were there any noises that you heard at the time of those flashes?

A: Yeah.

Q: What did you hear?

A: Gunshot.

(Trial tr. 617.)

{¶ 8} Watters did not report what he had seen to police. However, he eventually told police what he had witnessed after he had been charged with a major drug offense in federal court, and the FBI asked him if he knew anything about any murders. (Trial tr. 621.) Watters acknowledged during his trial testimony that he cooperated with the homicide investigation with the hope that he might receive a reduced sentence in his federal drug case. (Trial tr. 627.) However, he also stated that the State did not promise him anything in exchange for his testimony and that no one told him what to say in court. (Trial tr. 623.) Watters stated that he did not want to testify at Martin's trial, and he acknowledged that he could still go to prison despite his testimony. (Trial tr. 623.)

{¶ 9} As part of the homicide investigation, Detective Timothy Entenok ("Det. Entenok") presented Watters with a photo array of suspects and asked Watters to identify the shooter. (Trial tr. 901-903.) Watters identified Martin as the shooter in January 2007, approximately two months after the shooting. (Trial tr. 903.)

{¶ 10} Cleveland police investigating the shooting recovered a firearm at the crime scene. They later discovered that the firearm belonged to Martin. (Trial tr. 898.) Sergeant Nate Wilson ("Sgt. Wilson") of the Cleveland Police Department testified that because the bullet recovered from Williams's body was damaged, it

could not be matched to the recovered firearm. However, Sgt. Wilson compared a shell casing found at the crime scene on Hecker Avenue with other shell casings fired from Martin's gun and determined it was a match. (Trial tr. 822-823, 826, 876-880, and 899.)

{¶ 11} Crayton testified that on the day of the shooting, she was in the bathroom of her upstairs second-floor apartment doing her hair when she heard a gunshot coming from Hecker Avenue. (Trial tr. 742.) It was a warm day, and she had the bathroom window open. (Trial tr. 780.) Crayton's son had just left the house moments before the shooting so Crayton was concerned for his safety and looked out the window. (Trial tr. 742 and 757.) Crayton testified that when she looked out the window, she saw Martin running in the street. (Trial tr. 743, 748, and 750.) She heard three gunshots and the sound of a car accelerating. (Trial tr. 751-752.) She also heard Martin's voice say, "That's what you do for mother-fuckas." (Trial tr. 754.)

{¶ 12} Crayton immediately called 911, and police responded to her apartment. She told police that she had seen Martin running with the gun. Crayton testified that she had known Martin for ten years prior to the shooting because Crayton was close with Martin's aunt. (Trial tr. 738-739.) Crayton identified Martin in a photo array as the person she observed with the gun at the time of the shooting on November 11, 2006. (Trial tr. 760.)

{¶ 13} At the conclusion of the trial, the jury found Martin not guilty of aggravated murder but guilty of murder, a lesser included offense, along with the

one- and three-year firearm specifications. The court sentenced Martin to 18 years to life in prison, with credit for time served, and a $20,000 fine. Martin appealed, and this court affirmed his convictions. *State v. Martin*, 2009-Ohio-3282 (8th Dist.) ("*Martin I*").

{¶ 14} In July 2020, Martin filed a motion for leave to file a motion for new trial.[1] The trial court denied the motion, and Martin appealed. This court reversed the trial court's decision and remanded the case to the trial court to allow Martin to file a motion for new trial. *State v. Martin*, 2022-Ohio-1494 (8th Dist.).

{¶ 15} Martin filed the motion for new trial on remand, arguing he was entitled to a new trial because newly discovered evidence indicated that Watters had fabricated his trial testimony. Watters testified at a hearing on the motion and insisted that he knew nothing about the murder. According to Watters, the detectives told him that Martin had something to do with a murder and the police wanted "to put Jojwan Martin behind bars." (New trial tr. 18.) He asserted that the police wanted him to testify that he witnessed the murder, but he did not actually see anything. (New trial tr. 18.) He testified that he had made up every detail in his trial testimony. (New trial tr. 34.)

---

[1] In May 2016, Martin, through different counsel, filed a petition for postconviction relief. The attorney submitted an unsigned affidavit purportedly from Watters in support of the petition. The affidavit stated that he, Watters, had given false testimony against Martin at his trial. It further stated that Watters felt pressured from police and prosecutors to fabricate testimony at Martin's trial and that he did not actually witness Martin shoot anyone. The trial court denied the petition for postconviction relief, and the attorney who filed it was later subjected to disciplinary action related to it. *See Disciplinary Counsel v. Cheselka*, 2019-Ohio-5286.

{¶ 16} Watters explained that he only testified at trial because the federal agents told him they would do everything to keep him behind bars if he did not comply with their requests. Watters stated that he was facing 235 to 239 months in prison on the federal drug charges at the time of Martin's trial. When he was later sentenced after Martin's trial, he received a 60-month sentence, but he only served 36 months of the sentence. Watters testified that he completed the affidavits wherein he recanted his trial testimony because he wanted to come forward and "set this man free for something that he — he didn't do." (New trial tr. 25.) Watters maintained that he was not present at the time of the shooting that resulted in Williams's death and that his entire trial testimony was a lie. (New trial tr. 31-33.)

{¶ 17} Det. Entenok, who also testified at the hearing, explained that he was notified by Special Agent Doug Williams ("Special Agent Williams") of the FBI, that an inmate had information about Williams's murder. (New trial tr. 41-42.) Det. Entenok testified that he did not provide Watters with any information about the murder, that the information provided by Watters was consistent with the information provided by Special Agent Williams, and that he (Det. Entenok) did not threaten or make any promises to Watters in exchange for his trial testimony. (New trial tr. 47.)

{¶ 18} After the hearing, the trial court denied Martin's request for a new trial. In its judgment entry, the court stated, in relevant part:

> The Court finds that Detective Entenok's affidavit and hearing testimony were credible. Watters' story requires multiple law enforcement agencies, including the Cleveland Police, the Cuyahoga

County Prosecutor's Office, and the FBI, conspire together to convict Defendant. The FBI, especially, had no reason or incentive to go along with such a plan. Watters' affidavit and his hearing testimony stated that Cleveland detectives approached him first. While the FBI reports, Detective Entenok's trial testimony, affidavit, and hearing testimony indicate that the FBI spoke with Watters first and based on that conversation contacted Cleveland Police, not the other way around. Defendant's own motion stated "It is without dispute that neither the Cleveland Police nor the Cuyahoga County Prosecutor's Office could, in actuality, offer any promises, as they do not control federal prosecutions. There is, in fact, no accusation here that the Cuyahoga County Prosecutor's Office knowingly or intentionally induced Mr. Watters to lie."

{¶ 19} Having found that Watters's affidavits and hearing testimony were not credible, the court concluded that Watters's testimony would not have materially affected the outcome of the trial. The trial court denied the motion for new trial accordingly. Martin now appeals the trial court's judgment.

## II. Law and Analysis

### A. Standard of Review

{¶ 20} Motions for new trial are governed by Crim.R. 33. We review a trial court's judgment denying a motion for new trial for an abuse of discretion. *State v. Apanovitch*, 2020-Ohio-4217, ¶ 14 (8th Dist.), citing *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993). An abuse of discretion occurs when the trial court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 21} However, "a trial 'court does not have discretion to misapply the law.'" *Morgan v. Greater Cleveland Regional Transit Auth.*, 2025-Ohio-1655, ¶ 64, citing *Johnson* at ¶ 38. Thus, an abuse of discretion also occurs when a court ""applies

the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.”’” *Id.*, quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.), quoting *Berger v. Mayfield*, 265 F.3d 399 (6th Cir. 2001).

## B. Independent Review of the Record

{¶ 22} In the first assignment of error, Martin argues the trial court abused its discretion in failing to properly review the record. He contends the court adopted the State's proposed findings of fact and conclusions of law without conducting its own independent review of the record. He cites *State v. Riley*, 2024-Ohio-5712, in support of his argument.

{¶ 23} In *Riley*, the Ohio Supreme Court held that the trial court erred in summarily denying the defendant's application for postconviction DNA testing because it adopted the State's proposed findings of fact and conclusions of law without independently reviewing the record. *Id.* at ¶ 1 and 20. In reaching this conclusion, the Court identified certain errors in the State's proposed findings of fact and conclusions of law that the trial court mindlessly included in its judgment entry without correction. For example, the conclusions of law included a finding that a prior DNA test of the six shell casings at issue in the case were “definitive” when in fact the prior attempt to perform DNA testing resulted in “insufficient quantity of human DNA.” *Id.* at ¶ 16.

{¶ 24} The Court also noted the adopted findings of fact and conclusions of law included at least one typographical error that was in the State's findings of fact and conclusions of law. *Id.* at ¶ 18. The Court also observed that the judge who

adopted the State's findings of fact and conclusions of law was a newly appointed judge who did not preside over the trial and, therefore, did not have the same familiarity with the prior DNA testing as the judge who conducted the bench trial. *Id.* at ¶ 17.

{¶ 25} However, the *Riley* Court further stated that a "'trial court's verbatim adoption of the [S]tate's proposed findings of fact and conclusions of law, in an entry journalized the next business day after the [S]tate's filing, is not in and of itself erroneous.'" *Id.* at ¶ 14, quoting *State v. Bunch*, 2022-Ohio-4723, ¶ 28, citing *Jefferson v. Upton*, 560 U.S. 284, 294 (2010). And, the Court acknowledged that "no procedural rules prohibits 'trial courts from adopting a party's proposed findings of fact and conclusions of law.'" *Id.* at ¶ 15, quoting the amicus brief of the Ohio Attorney General.

{¶ 26} Indeed, it is well established that "a trial court does not err when it adopts a party's proposed findings of fact and conclusions of law as its own if it has thoroughly read the document to ensure that it is completely accurate in fact and law." *State v. Cody*, 2015-Ohio-2764, ¶ 37, citing *State v. Williams*, 2013-Ohio-2706, ¶ 25 (8th Dist.), citing *State v. Thomas*, 2006-Ohio-6588 (8th Dist.); *Anderson v. Bessemer*, 470 U.S. 564 (1985) (where a trial court adopts proposed findings verbatim, the adopted findings may only be reversed if they are clearly erroneous).

{¶ 27} Although the trial court's findings of fact and conclusions of law in this case tracked the language in the State's proposed findings of fact and conclusions of

law, the trial court added some additional text regarding its conclusions that demonstrated a synthesis and understanding of the issues. Moreover, as explained in further detail in the next assignment of error, there was nothing clearly erroneous about the findings of fact and conclusions. Unlike the trial court's judgment in *Riley*, 2024-Ohio-5712, there is nothing in the trial court's findings of fact and conclusions of law to suggest that it rubber-stamped the State's proposed findings of fact and conclusions of law.

{¶ 28} Therefore, the first assignment of error is overruled.

## C. Watters's Credibility

{¶ 29} In the second assignment of error, Martin argues the trial court erred in denying his motion for new trial. He contends the court abused its discretion in finding that Watters's recantation testimony and affidavits were not credible.

{¶ 30} A criminal defendant seeking a new trial based on newly discovered evidence bears the burden of demonstrating that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Parker*, 2012-Ohio-362, ¶ 33 (8th Dist.), citing *State v. Petro*, 148 Ohio St. 505 (1947); *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993).

{¶ 31} Newly discovered evidence in the form of testimony that purportedly recants the witness's prior trial testimony is viewed with the utmost caution. *State*

*v. Dew*, 2024-Ohio-69, ¶ 57 (8th Dist.), citing *State v. Nash*, 2006-Ohio-5925, ¶ 10 (8th Dist.). "'Recanting affidavits and witnesses are viewed with extreme suspicion because the witness, by making contradictory statements, either lied at trial, or in the current testimony, or both times.'" *State v. Nunez*, 2017-Ohio-5581, ¶ 35 (8th Dist.), quoting *State v. Gray*, 2010-Ohio-11, ¶ 18 (8th Dist.).

> Nevertheless, when a defendant seeks a new trial based on a witness's recanted testimony, the trial court must evaluate the credibility of the recanting witness. *Id.* at ¶ 36, citing *Toledo v. Easterling*, 26 Ohio App.3d 59, 60, 498 N.E.2d 198 (6th Dist.1985). The court must determine whether the recanting witness told the truth at trial or if the witness's recantation is true. *Id.* If the trial court determines the recantation is believable, the trial court must then determine whether the recanted testimony would have materially affected the outcome of trial. *State v. Brown*, 186 Ohio App.3d 309, 2010-Ohio-405, 927 N.E.2d 113, ¶ 47 (7th Dist.).

*Id.*; *see also State v. Gilbert*, 2018-Ohio-3789, ¶ 29 (8th Dist.). If the newly discovered evidence is not credible, the motion for new trial should be denied. *State v. Tucker*, 2013-Ohio-2527, ¶ 42-45 (8th Dist.).

{¶ 32} Watters executed three affidavits in support of Martin's motion for new trial. He states in each of them that he had no personal knowledge of the murder and that detectives asked him to provide false testimony designed to convict Martin. He also states that prosecutors pressured and threatened him to provide the false testimony. He explains that he was facing considerable prison time in his federal drug case and that they would "cut him loose" if he helped to convict Martin.

{¶ 33} Det. Entenok and the two assistant county prosecutors who represented the State in its prosecution against Martin also provided affidavits. Det.

Entenok averred in his affidavit that FBI Special Agent Williams informed him that when they were questioning Watters about his federal drug charges, Watters disclosed that he had information about Williams's murder. Det. Entenok and Special Agent Williams questioned Watters regarding his knowledge of the murder and neither he nor Special Agent Williams provided any information about the homicide investigation during the questioning. Det. Entenok further averred that at no point during his interactions with Watters did he threaten Watters or tell him what to say regarding the shooting of Williams.

{¶ 34} Blaise Thomas ("Thomas"), the lead prosecutor at Martin's trial, stated in his affidavit that he learned from federal authorities that Watters made a proffer relative to his federal charges and that Watters provided information about Williams's murder. According to Thomas, Watters's attorney was present during the proffer. Thomas also questioned Watters during a voir dire identification of witnesses to Williams's murder at a pretrial hearing, and Watters's attorney was also present at that hearing. Thomas stated that he did not threaten or coerce Watters to testify, did not tell Watters what to say at trial, and did not promise or recommend any particular sentence in Watters's federal case in exchange for information regarding Williams's murder.

{¶ 35} Michael Graham ("Graham"), the second prosecutor at Martin's trial, stated in his affidavit that he made no promises, threats, or other inducements to Watters in exchange for his testimony. He also stated that he did not see anyone

else make any promises, threats, or inducement to Watters either.  Finally, Graham averred that he did not instruct Watters on what to say during his testimony.

{¶ 36} If Watters's affidavits are to be believed, at least five separate individuals representing three different law enforcement agencies, including Watters's criminal defense attorney, would have had to conspire to pressure Watters to provide false testimony.  And in Watters's proffer, he stated that the FBI approached him and that he told the FBI what he witnessed.  Thereafter, the FBI contacted the Cleveland police.  There is no evidence that the Cleveland police knew that Watters was a witness to the murder until the FBI notified them about him.  And, the FBI would have no reason or incentive to fabricate evidence in a state murder case.

{¶ 37} Watters's testimony at the hearing on Martin's motion for new trial also contradicts the statements in his affidavits.  The affidavits, which were executed in 2011, 2015, and 2016, stated that detectives and prosecutors instructed him on what to say.  But at the hearing, Watters claimed he made up his trial testimony on his own.  Referring to his trial testimony, Watters testified, in relevant part:

> Q:  Now, with these answers that you gave quite specifically with great detail, who gave you that detail?  If it's all a lie, who gave you the detail to say these things?
>
> . . .
>
> A:  I don't. — no one.  No one.  They just — I haven't — this — I lied about everything.
>
> Q: So did you make it up or did somebody tell you to say these words?

A: I made it up.  I made up everything.

(New trial tr. 34.)

**{¶ 38}** It is unlikely that Watters could have made up very detailed testimony that matched the testimony of Crayton, the other eyewitness to the murder.  Both Watters and Crayton, who had known Martin for several years prior to the shooting, independently identified him as the shooter in separate photo arrays.  And, Sgt. Wilson compared a shell casing found at the crime scene with the recovered firearm that belonged to Martin and determined it was a match.  (Trial tr. 880.)  Martin's argument would require us to believe the matching shell casing was also just a coincidence.

**{¶ 39}** Considering the inconsistencies between Watters's affidavits and his hearing testimony together with the affidavits of Det. Entenok, Thomas, and Graham and the detailed trial testimony of Watters and Crayton, we can only conclude that Watters's recantation testimony is not credible.  His recanted testimony would not have materially affected the outcome of the trial.  Indeed, Crayton's eyewitness testimony and the matching shell casing would have provided conclusive evidence of Martin's guilt regardless of Watters's testimony.  We, therefore, cannot find that the trial court abused its discretion when it denied Martin's motion for new trial.

**{¶ 40}** The second assignment of error is overruled.

**{¶ 41}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)